UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
MICHAEL SCOTT,

                Plaintiff,

      -against-

PROCLAIM AMERICA, INC., d/b/a
ESIS PROCLAIM, ESIS, INC., ACE
GROUP HOLDINGS, INC., CARL
FERDENZI, individually, HEATHER ROY,
individually, and CANDACE KAINER,
individually,

                Defendants.
--------------------------------------------------------X

**MEMORANDUM & ORDER**
14-CV-6003 (DRH)(ARL)

**APPEARANCES:**

**PHILLIPS & ASSOCIATES**
Attorneys for Plaintiff
45 Broadway, Suite 620
New York, New York 10006
By:    Casey Wolnowski, Esq.

**STARK & STARK**
Attorneys for Defendants
993 Lenox Drive, Bldg. 2
Lawrenceville, New Jersey 08648
By:    Scott I. Unger, Esq.
        Cory A. Rand, Esq.

**HURLEY, Senior District Judge:**

Plaintiff Michael Scott ("Plaintiff" or "Scott") commenced this action against defendants

ProClaim America, Inc., d/b/a ESIS ProClaim ("ProClaim"), ESIS, Inc. ("ESIS"), ACE Group

Holdings, Inc. ("ACE"), and Carl Ferdenzi ("Ferdenzi")[1] (collectively "Defendants") asserting

claims under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* (the "FMLA") and the

---

[1] Plaintiff dismissed his claims against Heather Roy and Candace Kainer.

New York State Human Rights Law, N.Y. Exec. Law § 296 *et seq*. (the "NYSHRL"). Presently before the Court is Defendants' motion for summary judgment. For the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND

The following facts are taken from Defendants' Rule 56.1 Statement and Plaintiff's Rule 56.1 Counterstatement, unless otherwise indicated, and are undisputed unless otherwise noted.

**A.      Relationship of the Defendants**

ProClaim is a third-party administrator that provides claims and risk management services to the healthcare industry in the United States. In 2010, ESIS, a risk management services company and member of the ACE Group, acquired a majority share of the stock of ProClaim. While ProClaim now does business under the name "ESIS ProClaim," ESIS and ProClaim are separate corporate entities. ESIS "is a wholly-owned subsidiary of INA Holdings Corporation, which is a wholly-owned subsidiary of INA Financial Corporation, which is a wholly-owned subsidiary of INA Corporation, which is a wholly-owned subsidiary of Ace INA Holdings Inc.  [Defendant] Ace [], a wholly-owned subsidiary of Ace Limited, owns eighty percent (80%) of the stock of Ace INA Holdings Inc.; and Ace Limited, a publicly traded company organized under the laws of Switzerland, owns twenty percent (20%) of the stock of Ace INA Holdings Inc." Defs.' 56.1 ¶¶1-3, 13; Pl.'s Counter 56.1 ¶¶1-3, 13.

During the relevant period ProClaim had three offices: one in Melville (Long Island), New York; one in Houston, Texas; and one in Chicago, Illinois.  There have been less than twenty employees at its New York office and less than ten total work-at-home employees in New York, New Jersey, and Pennsylvania, as well as within seventy-five miles of its New York office.

The total number of ProClaim employees at its New York office, combined with either (1) the number of work-at-home employees in all of New York, New Jersey, and Pennsylvania, or (2) within seventy-five miles of its New York office, was less than fifty. Defs.' 56.1 ¶¶4-12; Pl.'s Counter 56.1 ¶¶4-12.

ProClaim maintains that it does not share employees with ACE or ESIS and does its own hiring and firing of employees; neither ACE nor ESIS plays a role in ProClaim's day-to-day operations and personnel decisions. Further, ProClaim has its own Human Resources department, separate from ESIS' and any other company's HR department, has a Policies and Procedures Manual that is specific to ProClaim employees and not shared or applicable to ACE, ESIS, or any other company; ProClaim employees were not subject to the policies and procedures of ACE or ESIS. Plaintiff denies these assertions, contending that (1) a certain individual "served" as an officer for both ProClaim and ESIS; (2) two others (Victoria Love and CJ Ferdenzi) "worked at []ProClaim as Client Services Coordinators and worked as Insurance Adjusters for ACE by monitoring trials on its behalf;" (3) the performance warning he received stated he may be eligible for severance under the ACE severance plan; and (4) "at the instruction" of certain ACE officers and "Counsel" he monitored 16 trials in New York for "ACE Insurance." Defs.' 56.1 ¶¶14-20; Pl.'s Counter 56.1 ¶¶14-20. It is undisputed that the performance warning (discussed *infra*) references the ACE severance plan. Defendants explain, however, that ACE was one of ProClaim's clients with ACE hiring it at times to provide mediation and monitoring services. It was pursuant to that relationship, for which ACE paid ProClaim, that Scott (as well as other ProClaim employees) monitored ACE matters. Ferdenzi Declar. (DE 45) ¶¶ 5-18. Further, CJ Ferdenzi was not a ProClaim employee but worked for it as an independent contractor on two

occasions and neither Love nor CJ Ferdenzi worked as adjusters for ACE. *Id*. at ¶¶ 23-26.

**B.      Plaintiff's Employment History**

Plaintiff began working for ProClaim in December 2005 and remained employed by

ProClaim until January 31, 2014, though the last day he worked was December 18, 2013.   He

served as an adjuster with the title of "litigation supervisor" in ProClaim's Long Island, New

York office. He received a Form W-2 from ProClaim each year. Neither ACE nor ESIS had any

involvement in Plaintiff's hiring or FMLA leave or the cessation of his employment. Defs.' 56.1

¶¶21-25; Pl.'s Counter 56.1 ¶¶21-25.

**C.      Plaintiff's Medical Issues**

Plaintiff apparently suffered a concussion outside work in November 2013, prior to

Thanksgiving; six or seven days later, not having missed any work, he visited his primary care

physician, Dr. Halper, complaining he felt woozy and unsteady and was having trouble driving

and reading.  Dr. Halper diagnosed him with a concussion and told him to follow up with a CT

scan to rule out the possibility of a brain bleed. He did not tell Scott not to go to work. The first

day Plaintiff missed work following his head injury was December 19, 2013. Defs.' 56.1 ¶¶27-

30; Pl.'s Counter 56.1 ¶¶27-30.

Plaintiff underwent a CT scan on Saturday, December 7, 2013. Later that evening or early

the next morning, he accessed his radiologist's online portal to look at the results of his scan and

learned that it revealed a cyst, but no bleed, in his brain. On December 8, 2013, he sent Ferdenzi

an email stating he received a "bad result" on the CT scan. A day or so later, Scott spoke with the

radiologist who explained that the cyst was not an issue or malignant and no operation was

necessary; it was likely congenital and something Plaintiff had since birth. The cyst did not cause

Plaintiff to miss any work; he still has the cyst today and is able to work with this cyst. Defs.' 56.1 ¶¶34-38; Pl.'s Counter 56.1 ¶¶34-38.

After work on Wednesday, December 11, 2013, Scott went to an ENT doctor because his left ear "hurt like heck." The doctor removed a cholesteatoma[2] from Plaintiff's left ear, an out-patient procedure performed at the ENT doctor's office during Plaintiff's approximately one-hour visit. The ENT doctor did not keep Plaintiff out of work and did not give Plaintiff any pain medication following the procedure. Plaintiff went to work the next day and did not miss any work as a result of the procedure. Defs.' 56.1 ¶¶40-44; Pl.'s Counter 56.1 ¶¶40-44.

**D. Events Leading to the Termination of Plaintiff's Employment**

    1. <u>Events Prior to Plaintiff's Last Day of Work</u>

In December 2013, Plaintiff was working on the Nyack Hospital account, a ProClaim client, handling its malpractice claims. On December 16, 2013, he and Ferdenzi, his supervisor, had a meeting with Nyack Hospital in Nyack, New York; Plaintiff was able to complete his work for this meeting, including preparing a report. Plaintiff went to work and was in the office all day on December 17, 2013. Defs.' 56.1 ¶¶45-47; Pl.'s Counter 56.1 ¶¶45-47.

Also in December 2013, Plaintiff was working on the Brooklyn Hospital account, handling its claims. Plaintiff and Ferdenzi were scheduled to attend a monthly client meeting with Brooklyn Hospital on December 19, 2013, which meeting had been scheduled since November 21, 2013. The task of preparing a report of open litigation and open claims for that meeting was assigned to Scott. He was at work and/or attending client meetings for work each

---

    [2] "Cholesteatoma is an epithelial cyst (made from the tissue and cells that make skin). Technically, it is not a tumor, but it grows independently. Cholesteatomas grow slowly, yet are able to erode and destroy bone in their path." http://www.nycornell.org/ent/cholesteatoma.html.

and every workday in December through and including December 18, 2013, the day before the Brooklyn Hospital meeting. Defs.' 56.1 ¶¶48-52; Pl.'s Counter 56.1 ¶¶48-52.

On Tuesday, December 17, 2013, at 4:01 PM, Plaintiff sent an email to Donna Thomas, Brooklyn Hospital's risk manager, stating: "I have been out following surgery and there will be no full report with each and every case. We never heard back in this regard. As to Wed, we will discuss the new lawsuits and the cases that we feel are in need of review of reserve review [sic] (@10). I will have a report tomorrow." However, Scott had not been out of work following the cholesteatoma removal procedure. Defs.' 56.1 ¶¶53-54; Pl.'s Counter 56.1 ¶¶53-54.

Scott went to work on Wednesday, December 18, 2013 and while at work attempted to contact Ms. Thomas to try and cancel the meeting scheduled for the following day. He and Ferdenzi spoke on the phone at some point that afternoon, during which call Plaintiff told Ferdenzi that the report would not be ready in time for the Brooklyn Hospital meeting the following morning. At 2:45 p.m., Scott sent Ferdenzi an email stating: "As discussed, I had surgery last Wednesday to remove a tumor in my left ear. I have tried as best as I could to work through the pain and dizziness last week, but I am unable to do so. I am having residual problems and am unable to work. I am waiting on additional records to be referred to a further specialist. Three new cases came in for Brooklyn and accordingly, I am dropping them off with you. Attached please find a PTO [Paid Time Off] form. I will advise when I am medically cleared to return." At 3:11 p.m., he sent Ferdenzi another email stating: "Carl, I[']ve been on phone with docs all day. I have a high fever and need to go back to discuss the results of the tumor extraction. I tried to cancel with Donna and she cant [sic] do it. We have to cancel." Eight minutes later Scott sent a third email stating: "I am going to call in sick if we do not cancel. That

is my only option, since I am sick." Fifteen minutes later he submitted a PTO form to Human Resources. That same afternoon, Scott sent Ferdenzi another email stating: "I called her [Thomas] 4x and emailed her to cancel this and she never returned one call or email. This is not going to cut it report below [referencing the report in the December 17, 2013 email]." Ferdenzi tried to cancel the meeting, but the client would not agree. He then sent Scott an email stating: "Mike, You have been telling me all week you would have about 40 [] files done. You are the one who said you could do it. I never put pressure to do them all. Now you say you are sick? I will call them and go in to discuss the doc program. You need to work on this report and get it done asap. You were fine all week." Plaintiff left the office around 4 p.m. on December 18, 2013; that was the last time he was at work. Defs.' 56.1 ¶¶55-65; Pl.'s Counter 56.1 ¶¶55-65.

2.    <u>Events After Plaintiff's Last Day of Work</u>

Plaintiff did not attend the December 19, 2013, Brooklyn Hospital meeting and did not submit a doctor's note regarding his absence. Ferdenzi attended the meeting without the report. Defs.' 56.1 ¶¶67, 69; Pl.'s Counter 56.1 ¶¶67, 69.

On December 20, 2013, Scott sent an email to Ferdenzi and Heather Roy (a member of the Human Resources Department) stating: "I went to the doc yesterday and as advised, I had an infection following the removal of the cholesteatoma. Apparently, it is a really rare thing, but they found it before it got inside the mastoid. Luckily it is benign, but apparently they have a pretty high rate of recurrence, so we will just have to monitor it going forward. That's what was causing the dizziness and the instability. She put me on Oflaxacin, and it is just for five days and it should clear up the infection. I spoke with Heather today and will e-mail her on Sunday and hopefully this thing is cleared up well enough to come in. I think it is starting to kick in now.

Thanks Mike." Defs.' 56.1 ¶68; Pl.'s Counter 56.1 ¶68.

Ferdenzi decided to prepare a Performance Written Warning ("Warning") to Plaintiff because he failed to prepare the report for the Brooklyn Hospital meeting, and did not tell Ferdenzi until the last minute that it was not done.[3] On Friday, December 20, 2013, after drafting the Warning Ferdenzi intending to email it to Heather Roy, accidently emailed it to Plaintiff instead. In the Warning, Ferdenzi wrote:

> You had consistently advised me that you were preparing a copy of your report that would be needed for a meeting with The Brooklyn Hospital on 12/19/2013. Despite the fact that you were sick you were in the office and following the Nyack meeting on Monday 12/16/2013 you advised you would have a report ready. You continued to advise you would have the report on Tuesday when you were in the office all day. On Wednesday 12/18/2013 the day before the meeting, I called and spoke with you at 5PM to arrange travel the next day and you advised you would not be attending because you were sick. At no time did you advise me that you had not completed the report. As a result I was put in a very untenable position with the client and had to meet with them unprepared. This is the reason you are being cited.

Defs.' 56.1 ¶72; Pl.'s Counter 56.1 ¶72. The Warning went on to state that if Plaintiff decided to continue his employment with ProClaim, he would be subject to a 90-day probationary period whereby he needed to comply with conditions designed to ensure that he did not miss future deadlines (e.g., reporting to Ferdenzi daily with work progress status updates and completing and submitting all claims reports at least a week in advance of the meeting). It advised Scott, "You have seven days to consider whether to proceed under the terms of the [Warning]. If you choose not to do so, you may be eligible for severance under the ACE severance plan. If you would like

---

[3] Scott denies this stating: "On December 16, 2013 he told Ferdenzi that he was having some difficulty with the report for Brooklyn Hospital because he was having trouble with his ear and was having trouble reading small print." Pl.'s Counter 56.1 ¶70.

more info, please see me or your Human Resources Representative." Defs.' 56.1 ¶¶70-74; Pl.'s Counter 56.1 ¶¶70-74.

Plaintiff was upset about receiving the Warning and contacted Heather Roy the morning he received it. Plaintiff had a telephone conversation with Roy and Ferdenzi later that day. During that conversation, he requested that Roy send him additional information about the severance referenced in the Warning. Defs.' 56.1 ¶¶75-77; Pl.'s Counter 56.1 ¶¶75-77.

Plaintiff did not work and was not in the office on December 19 or 20, 2013; he called in sick on those days, using PTOs for each day. Defs.' 56.1 ¶79; Pl.'s Counter 56.1 ¶79.

On Monday, December 23, 2013, via email Roy advised Plaintiff that she did not yet have the requested information regarding the severance, including answers to Plaintiff's questions from the previous Friday about what type of severance he would be entitled to if he did not return. Plaintiff replied to Roy's email and asked if she could provide a time frame as to when she would have answers to his questions. Roy responded that she expected to have answers by the end of the week, and asked Plaintiff if he was considering not returning. In his reply, Plaintiff did not say "no" or otherwise answer her question in the negative; instead he asked if he could call her. That afternoon, Plaintiff and Roy spoke over the phone, during which call Plaintiff wanted to know how much severance he would receive if he decided to leave. According to Roy, Scott confirmed to her that he was considering not coming back; Scott denies this. Defs.' 56.1 ¶¶80-84; Pl.'s Counter 56.1 ¶¶80-84.

Plaintiff submitted a typed response to the Warning on December 26, 2013, explaining the reasons he felt the Warning was incorrect and requesting that Ferdenzi rescind it (the "Response").  He indicated he could not work under the requirements imposed thereby, and also

alleged disability discrimination and that the Warning was in retaliation for his "request at an accommodation due to a medical disability." According to Plaintiff, the "accommodation" he asked for was "that we cancel the meeting with Brooklyn Hospital Center." Plaintiff accused ProClaim of "discriminat[ing] against [Plaintiff] due to a medical disability." He alleged that ProClaim was put "on notice of this medical situation on 12-7-13 via e-mail," "was advised that I might need time off for this medical disability on 12-8-13, also via e-mail," and that Ferdenzi "verbally denied my request for time off and never responded to my email indicating that time off may be needed."  The e-mails referenced in the Response are the e-mails Plaintiff previously sent to Ferdenzi indicating a "bad result on the CT" and that Plaintiff "may need some time;" yet, a day or two later Scott learned that there were no issues and that the cyst was benign. He did not claim to have asked for any time off again until he submitted a PTO form on December 18, 2013, seeking to take off the following day, viz. the day of the Brooklyn Hospital meeting, which PTO request was not denied. Defs.' 56.1 ¶¶85-89; Pl.'s Counter 56.1 ¶¶85-89.

Prior to December 26, 2013, Plaintiff never submitted any documentation from any health care provider regarding any need for time off from work.  On that date, he submitted a letter from his physician, Dr. Halper, stating that he "is suffering from post-concussion syndrome and advised no work at this time. Patient will follow up in ten days for evaluation. Patient has also seen an ENT, neurologist and ophthalmologist who agree with above diagnosis. Any questions, please feel free to call." On an attachment to the doctor note, Scott wrote: "To date, I have not received the FMLA documents." According to Plaintiff, during his December 26, 2013 office visit, he told Dr. Halper that he was still experiencing the same symptoms that he complained about in November and that the symptoms had never cleared. Defs.' 56.1 ¶¶91-96; Pl.'s Counter

56.1 ¶¶91-96.

Plaintiff's FMLA leave was approved by Human Resources on December 30, 2014, at which time he had already been out of work for over ten days. Ferdenzi had no involvement in the decision whether to grant or deny Scott FMLA leave. Defs.' 56.1 ¶¶97-98; Pl.'s Counter 56.1 ¶¶97-98.

In mid-January 2014, Scott was still upset and talking with Roy about the Warning. He felt it was "unfair," that he could not work under the terms and conditions of the 90-day probationary period, and that some of the conditions were "not feasible" or "did not make any sense." On January 15, 2014, he sent an the following email to Roy:

> Heather, just to update you. I'm going to try to get to see doc on Friday. I have a few questions relative to the warning, and my questions/comments. I also have some questions on the amount of the PTO as it appears that you might not have deducted same on the last paycheck. I want to make sure we are all square there and I don't want to take anything that I am not entitled to take. Would you be available sometime Friday (after doc), late morning or early afternoon?

Defs.' 56.1 ¶101; Pl.'s Counter 56.1 ¶101. Roy responded by e-mail that she would be available for a call on Friday and to let her know what time he wanted to speak. Defs.' 56.1 ¶¶99-102; Pl.'s Counter 56.1 ¶¶99-102.

On Friday, January 17, 2014, Plaintiff had a half-hour telephone conversation with Roy; Ferdenzi was not on the call. According to Roy, Plaintiff informed her that he was resigning because he could not work under the terms and conditions laid out by the Warning and that instead he was electing to receive the severance referenced therein rather than return to work on a 90-day probationary period. During the call, Roy conducted an Employee Exit Interview with

Plaintiff, in which she asked for a statement as to why he was leaving, to which he responded that he "could not work under the conditions hiring [manager] laid out in written warning." During the call, Roy contemporaneously filled out an Employee Exit Interview Form with Plaintiff's responses to the questions therein. Scott's version of this conversation is markedly different. He asserts that he asked Roy if he was going to get a response to the allegations of discrimination and retaliation he made in his Response to the Warning, to which she replied, Ferdenzi "is not going to speak with you. [He] is pissed off at you. He doesn't want to speak with you and the decision has been made to terminate your employment. Your last day will be January 31, 2014. We are going to classify it as a 'work force reduction' and will pay you a couple of weeks severance and your remaining vacation days." Defs.' 56.1 ¶¶103-09; Pl.'s Counter 56.1 ¶¶103-09.

Following that telephone conversation, Plaintiff sent Roy the following email:

> Please allow this to confirm our call of this morning and confirm the termination of my employment as of today. ESIS ProClaim will pay me one (1) month severance in addition to the remaining eleven (11) PTO days that were accrued. Additionally, you have confirmed that ESIS ProClaim/ProClaim America, Inc. will not contest unemployment benefits and also, will provide a neutral employment reference going forward. Kindly advise if this is an accurate portrayal of our conversation.

Defs.' 56.1 ¶110; Pl.'s Counter 56.1 ¶110. Roy replied shortly thereafter: "Mike, as we discussed, the severance will be 2 weeks plus the 11 days of PTO. Please confirm that you understand this. ProClaim will not contest your unemployment." Plaintiff replied that day: "ok two (2) weeks, and the reference issue. Thanks, mike." Roy answered: "Not a problem. 2 weeks and again, we will not contest your unemployment. I will let Carl and Sam know." Plaintiff followed up: "ok 2

weeks plus the 11 days. What about the employment reference?," to which Roy replied: "what reference? We didn't speak about a reference, only the unemployment." Plaintiff clarified in his next e-mail: "we spoke last time about any references being neutral. Just limited to dates of employment." Roy confirmed: "Yes you are correct. That is all the information we are allowed to give. If someone calls we verify employment start and end date and salary and position with the company. Nothing else is given." Plaintiff responded: "ok. Just wanted to make sure. Thanks." Roy then wrote: "I will have Candace get your cobra forms out ASAP, since your last day on benefits will be 1/31/2014. I will also prepare a formal letter outlining the severance and last pay period," to which Plaintiff responded "thanks." Defs.' 56.1 ¶¶111-17; Pl.'s Counter 56.1 ¶¶111-17.

On Tuesday, January 21, 2014, Roy sent Plaintiff a letter confirming that he had resigned, which letter Plaintiff acknowledges having received but to which Plaintiff never responded or followed-up in any manner. Specifically, the letter stated that it "serve[d] as [ProClaim's] official notice to accept your resignation." It stated further in relevant part: "You[r] last day of employment with ProClaim was January 17th. As stated previously we will pay you two weeks severance and your available PTO. Please remember, PTO time is not accrued while out on Medical leave. You have 10 days available. . . . If you have further questions please feel free to contact me. It has been a pleasure working with you and we wish you well in your future endeavors." Plaintiff did not write back to Roy after receiving this letter confirming his resignation; he never responded in any form asserting that he did not resign but rather had been terminated. Defs.' 56.1 ¶¶118-22; Pl.'s Counter 56.1 ¶¶118-22.

On January 22, 2014, Ferdenzi sent Roy an e-mail with the subject line, "Mike," asking:

"How do I tell people - Just say he resigned and leave it at that?" Roy replied: "I normally say the[y] are no longer with the company if asked just say he resigned. We can't go into specifics." Defs.' 56.1 ¶¶123-24; Pl.'s Counter 56.1 ¶¶123-24.

Plaintiff now alleges that the termination of his employment was the result of ProClaim firing him in retaliation for going out on FMLA leave and because of his alleged disability. Defs.' 56.1 ¶ 125; Pl.'s Counter 56.1 ¶ 125.

## DISCUSSION

### I.      Summary Judgment Standard

Summary judgment pursuant to Rule 56 is appropriate only where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. SYS. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>*Anderson v. Liberty Lobby, Inc*</u>., 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there is a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002,

1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (*quoting Anderson*, 477 U.S. at 252) (internal quotation marks omitted), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (internal quotation marks omitted), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court considering a summary judgment motion must also be "mindful . . . of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing Anderson, 477 U.S. at 252), because the "evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). "[W]here the nonmovant will bear the ultimate burden of proof at trial on an issue, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Id*. at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.' " *Id.* at 211 (citing *Matsushita*, 475 U.S. at 587).

## II.    Summary of Arguments

Defendants maintain that Scott cannot show he exercised rights protected under the FMLA because (1) he was never an eligible employee; and (2) he cannot establish that his leave

was due to a serious health condition that made him unable to perform the functions of his position. Furthermore, he did not suffer an adverse employment action under circumstances giving rise to an inference of retaliatory intent because he was not terminated, but rather he resigned. The FMLA claim against Ferdenzi, Ace and ESIS should be dismissed as neither was Plaintiff's employer. Turning to Scott's NYSHRL disability discrimination claim, Defendants assert that it should fail for the same reasons as the FMLA claim, as well as the inability to meet the definition of disabled and because he could not perform the essential functions of his job.

In response, Scott argues that he is a covered employee, relying on the concept of single integrated employer, and that his condition meets the requirements of a serious health condition; in any event, having granted him FMLA leave Defendants are estopped from denying his eligibility. Finally, he maintains he did not resign, but was terminated and thus suffered an adverse employment action.

## III.    Plaintiff's FMLA Retaliation Claim Against ProClaim and Ferdenzi

### A.    Legal Standard

The FMLA prohibits retaliation against employees who engage in protected activity. *See Potenza v. City of New York*, 365 F.3d 165, 167 (2d Cir. 2004). Such retaliation claims are analyzed using the *McDonnell Douglas* "burden-shifting" formula. *See, e.g., Kessler v. Westchester Cnty. Dep't of Social Servs.*, 461 F.3d 199, 205 (2d Cir. 2006). First, however, a plaintiff must establish that both he and his employer are subject to the FMLA. *See Coutard v. Municipal Credit Union*, 848 F.3d 102, 108 (2d Cir. 2017) (stating that two of the four "principal facets to the scope of the [FMLA are] (1) the employers to which it applies, [and] (2) the employees who are eligible for FMLA leave . . . .").

An FMLA eligible employee is an employee of a covered employer[4] who, *inter alia*, "is employed at a worksite where 50 or more employees are employed by the employer within 75 miles of that worksite." 29 C.F.R. § 825.110(a)(3) (the "50/75 requirement").[5]  In order to meet the 50/75 requirement, Plaintiff, whose "direct employer" is ProClaim, relies upon the doctrine of "integrated employer" as it is undisputed that his ProClaim worksite does not meet it.

**B.    Single Integrated Employer Doctrine**

 The "single employer'" or "single integrated employer" doctrine is one of two doctrines[6] "developed to allow a plaintiff to assert employer liability in the employment discrimination context against entities that are not [his] formal, direct employer. A 'single employer' situation exists 'where two nominally separate entities are actually part of a single integrated enterprise'." *Griffin v. Sirva*, *Inc*. 835 F.3d 283, 292 (2d Cir. 2016) (internal citations omitted).  As a general matter, "the law only treats the employees of a corporate entity as the employees of a related entity under extraordinary circumstances." *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996)

> The single employer doctrine provides that, in appropriate
> circumstances, an employee, who is technically employed on the

---

[4] A covered "employer" includes "any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year."  *Coutard*, 848 F.3d at 108 (citing 29 U.S.C. § 2611(4)(A)(i)).

[5] There is no dispute that Scott meets the requirements for number of hours worked and length of employment.

[6] The other doctrine is the "joint employer doctrine" and "applies where there is no single integrated enterprise, but where two employers 'handle certain aspects of their employer-employee relationship jointly. For example, an employee formally employed by one entity can be found to be constructively employed by another entity, and thus may impose liability for violations of employment law on the constructive employer." *Griffin*, 835 F.3d at 292-93 (internal citations and quotation marks omitted).

> books of one entity, which is deemed to be part of a larger
> single-employer entity, may impose liability for certain violations
> of employment law not only on the nominal employer but also on
> another entity comprising part of the single integrated employer.
> To determine whether two separate entities should be considered a
> single employer for the purposes of employment discrimination
> claims, courts have relied on four considerations: (1) interrelation
> of operations; (2) centralized control of labor relations; (3)
> common management; and (4) common ownership or financial
> control. Although no one factor is determinative . . . control of
> labor relations is the central concern.

*Griffin,* 835 F.3d at 292 (internal quotation marks and citations omitted) (alteration in original).

As to control of labor relations, the "critical question" is "[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination?" *Cook v. Arrowsmith Shelburne, Inc*., 69 F.3d 1235, 1240 (2d Cir. 1995).

   In determining whether there is a "sufficient interrelation of operation" between the related entities, courts have considered factors such as "whether the parent was involved directly in the subsidiary's daily business decisions; whether the two entities shared employees, services, records, or equipment; and whether the entities commingled assets or finances . . . ." *Ennis v. TYCO, Int'l Ltd.*, 2004 WL 548796, at *4 (S.D.N.Y. Mar. 18, 2004) (citations omitted). The requisite degree of control over labor relations is demonstrated where the parent has reviewed applications for employment at the subsidiary, approved personnel status reports, and approved all major employment decisions for the subsidiary. *See, e.g., Cook,* 69 F.3d 1235. The remaining factors, the degrees of common management and common ownership, "are considered less important, owing to the fact that 'they represent ordinary aspects of the parent-subsidiary relationship.' " *Ennis*, 2004 WL 548796, at *5 (quoting *Meng v. Ipanema Shoe Corp*., 73 F. Supp.2d 392, 403 (S.D.N.Y. 1999)).

Here the evidence of interrelation is insufficient to permit a trier of fact to find that ESIS, ACE, and ProClaim are a single employer. Scott's reliance on his claim that he occasionally provided trial monitoring service for ACE is unavailing as in such cases ACE was a client of ProClaim. Ace would retain ProClaim in connection with some of its cases with ProClaim billing ACE for its time; in other words there was a vendor-vendee relationship when such services were provided for ACE. (*See* Ferdenzi Dec. 5-16; Ferdenzi Dep. at 23:10-21, 24:17-25.) That Scott's Warning referenced ACE's severance plan and that all three companies used the same database[7] are insufficient in this case to show an integrated employer. *Cf. Balut v. Loral Elec. Sys.*, 988 F. Supp. 339, 347 (S.D.N.Y. 1997) (use of parent's policy statements regarding employment insufficient to show integrated employers), *aff'd*, 166 F.3d 1199 (2d Cir. 1998). Most important is the (1) absence of any evidence that either ESIS or ACE reviewed applications for employment at ProClaim or approved personnel status reports or major employment decisions for ProClaim, (2) Scott's concession that neither entity played a part in his FMLA leave, and (3) the absence of any evidence that either ESIS or ACE played any role in the termination of Scott's (or any other ProClaim employee's) employment.[8]

Finally, Plaintiff points to no evidence in the record as to the number of employees either ESIS or ACE employed within 75 miles of his worksite. Plaintiff's blanket assertion that "ESIS alone employs over 1,300 employees" (Scott Declar. ¶ 4) does not raise an inference that he was

---

[7] Defendants dispute that the database refernced by Plaintiff was used by ACE and ESIS. While the Court assumes that it was, it notes that Plaintiff does not set forth the basis for his knowledge of this assertion.

[8] Similarly, the evidence is insufficient for a trier of fact to conclude that either or both ESIS and ACE are joint employers with ProClaim.

"employed at a worksite where 50 or more employees are employed by the employer within 75 miles of that worksite."

That the 50/75 requirement has not been met does not end the matter because Scott asserts that Defendants are estopped from denying his FMLA eligibility. It is to that topic that the Court now turns.

### C.     Application of Estoppel to Plaintiff's FMLA Retaliation Claim

Plaintiff argues that having granted him FMLA leave, Defendants are estopped from claiming that he is not an eligible employee even if the 50/75 requirement is not met or he does not have a serious medical condition.

An employer may be estopped from denying an employee's FMLA eligibility where "1) the party to be estopped makes a misrepresentation of fact to the other party with reason to believe that the other party will rely upon it; 2) and the other party reasonably relies upon it; 3) to [his] detriment." *Kosakow v. New Rochelle Radiology Assoc.*, 274 F.3d 706, 725 (2d Cir. 2001).

Here, it is undisputed that ProClaim offered and approved Scott for FMLA leave.  As a result Scott took leave to his detriment. Having offered and approved his leave, ProClaim is now estopped from denying that Scott was an eligible employee with a serious health condition. *See Cooper v. New York State Nurses Ass'n*, 847 F. Supp.2d 437 (E.D.N.Y. 2012). The Court finds unavailing the argument that Scott could not have relied on the approval of his FMLA leave because he was already out when the leave was approved. Undisputed is Plaintiff's deposition testimony that on December 20, 2013, without him inquiring, Roy told him to take as much time as he needed because he was eligible for twelve weeks of FMLA leave and she would send him the paperwork. *See* Scott Dep. at 128-132; *see also* Scott Decl. at 19-20.

Estoppel does not apply, however, to ESIS and ACE given the absence of any evidence that either played any role in the granting of Scott's FMLA leave.

### D. Did Scott Suffer An Adverse Employment Action?

To make out a prima facie case of retaliation, a plaintiff must put forth

> evidence sufficient to permit a rational trier of fact to find (1) that []he engaged in protected participation or opposition under [the relevant statute], (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.

*Kessler v. Westchester Cnty. Dep't of Social Servs.*, 461 F.3d 199, 205-06 (2d Cir. 2006) (citation omitted).

ProClaim's argument on this issue addresses only whether Plaintiff suffered an adverse employment action. *See* Defs.' Mem. at 15-17.

Since it is ProClaim's position that Scott resigned and was not terminated, it appears ProClaim takes the related position that it took no adverse action against Scott. In support of this argument ProClaim asserts "[a]ll of the documentary evidence in this case definitively demonstrates that Plaintiff resigned from ProClaim because he was unwilling to work under the conditions of the ninety-day probationary period imposed under the performance warning." Defs.' Mem. at 15. In other words, it was Scott's own action - his resignation - upon which he bases his retaliation claim. However, according to his deposition testimony, when Scott spoke to Roy on January 17, 2014, and asked if he was going to get a response from Ferdenzi as to his allegations of discrimination and retaliation, she replied in part: [*T]he decision has been made to terminate your employment. Your last day will be January 31, 2014. We are going to classify it as

a 'work force reduction' and will pay you a couple of weeks severance and your remaining vacation days." Scott Dep. at 153-155 (emphasis added). While a trier of fact may choose not to believe Scott, this testimony is sufficient to raise a material question of fact which cannot be resolved as a matter of law on the present record.

### E.   The FMLA Claim Against Ferdenzi

"A person can be individually liable under the FMLA only if that person is an employer." *Rivera v. Crowell & Moring LLP*, 2016 WL 796843, *14 (S.D.N.Y. Feb. 18, 2016) (citing *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp.2d 349 (S.D.N.Y. 2012). The term employer can include "any person who acts directly or indirectly in the interest of an employer to any of the employer's employees." 29 C.F.R. § 825.104(d). "Under the economic reality test that has been adopted in this Circuit, courts consider whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Rivera*, 2016 WL 796843, at *14 (internal quotation marks omitted) (quoting *Malena*, 886 F. Supp. 2d at 365). "No one of the four factors standing alone is dispositive." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 139 (2d Cir. 1999).

Here, there is evidence that Ferdenzi hired Scott (Ferdenzi Dep. at 33) and, given the conditions he imposed in the performance warning, he had some control over the condition of Scott's employment. Finally, Scott recitation of the January 17, 2014 telephone conversation with Roy suggests Ferdenzi had the power to terminate Scott. Accordingly, there is a question of fact as to whether Ferdenzi was an employer under the FMLA.

The motion for summary judgment on the FMLA claim against Proclaim and Ferdenzi is

denied.

## IV. Plaintiff's NYSHRL Disability Claim Against ProClaim and Ferdenzi

### A. Legal Standard

Section 296 of the NYSHRL prohibits an employer from discriminating against an individual on the basis of disability. N.Y. Exec. Law § 296(1)(a). Employers may not fire a disabled individual on the basis of his or her disability, nor may they discriminate against him or her "in compensation or in terms, conditions or privilege of employment." *Id*. In addition, employers may not "refuse to provide reasonable accommodations to the known disabilities . . . of an employee." Id. § 296(3)(a).

To make a prima facie case for disability discrimination for failure to accommodate under the NYSHRL, a plaintiff must show that: (1) his employer was subject to the NYSHRL; (2) he was disabled, within the meaning of those statues; (3) he was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability. *Mobley v. Madison Square Garden LP*, 2012 WL 2339270, at *3 (S.D.N.Y. June 14, 2012) (citing *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 n.3 (2d Cir.2006)).

### B. Disability and Otherwise Qualified

Defendants maintain that Scott cannot prevail on his NYSHRL claim as he does not meet the definition of disability and because he was not otherwise qualified.

The NYSHRL defines disability as:

> (a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is

> demonstrable by medically accepted clinical or laboratory
> diagnostic techniques or (b) a record of such an impairment or (c) a
> condition regarded by others as such an impairment, provided,
> however, that in all provisions of this article dealing with
> employment, the term shall be limited to disabilities which, upon
> the provision of reasonable accommodations, do not prevent the
> complainant from performing in a reasonable manner the activities
> involved in the job or occupation sought or held.

N.Y. Exec. Law § 292(21).

According to the undisputed facts Scott submitted to ProClaim a doctor's note from Dr.

Halper stating that he suffered from "post concussion syndrome," which is

> a complex disorder in which various symptoms — such as
> headaches and dizziness — last for weeks and sometimes months
> after the injury that caused the concussion. Concussion is a mild
> traumatic brain injury, usually occurring after a blow to the head.
> Loss of consciousness isn't required for a diagnosis of concussion
> or post-concussion syndrome. In fact, the risk of post-concussion
> syndrome doesn't appear to be associated with the severity of the
> initial injury.
> In most people, post-concussion syndrome symptoms occur within
> the first seven to 10 days and go away within three months, though
> they can persist for a year or more.

http://www.mayoclinic.org/diseases-conditions/post-concussion-syndrome/basics/definition/con-

20032705. As such post concussion syndrome falls within the NYSHRL's definition of

disability. Accordingly, contrary to Defendants' assertion that he does not meet the definition of

disabled, Scott has made the requisite prima facie showing that he was disabled under the

NYSHRL.

As to the third prong of Scott's NYSHRL claim, Defendants' argument that Scott was

"not otherwise qualified" to perform the essential functions of his job because he "claims he was

unable to work and therefore requested medical leave for an indeterminate period of time"

(Defs.' Mem. at 19), is unavailing. First, Defendants fail to point to any evidence that Scott's leave was for an indeterminate amount of time. Rather, the evidence in the record is that he was approved for FMLA leave, which leave is limited to 12 weeks.  Indeed, Roy sent Ferdenzi an email stating that Scott "has been officially notified that he is taking FMLA week [sic] He has 12 weeks of protection for his position." (Ferdenzi Dep. at 114.)

Moreover, "a temporary leave of absence, even an extended leave, can be a reasonable accommodation." *LaCourt v. Shenanigans Knits, Ltd.*,  2012 WL 6765703, at *5, 38 Misc.3d 1206(A) (N.Y. Sup. Ct. Nov. 14, 2012). Indeed, "there is no accommodation (whether it be indefinite leave time or any other need created by a disability) that is categorically excluded from the universe of reasonable accommodation." *Haight v. NYU Langone Med. Ctr., Inc.*, 2014 WL 2933190, at *18 (S.D.N.Y. June 27, 2014) (quoting *Phillips v. City of New York*, 66 A.D.3d 170, 884 N.Y.S.2d 369, 378 (1st Dep't 2009)). *See generally Union Free Sch. Dist. No. 6 of Towns of Islip & Smithtown v. N.Y. State Human Rights Appeal Bd.*, 35 N.Y.2d 371, 376 (N.Y.1974) (observing that pursuant to the NYSHRL, individuals must be permitted to take advantage of accrued sick leave if suffering from a temporary disability). Thus, that he may have needed to take a leave does not disqualify him from taking advantage of the NYSHRL's protection. On the present record, Scott has made a prima facie showing that he was "otherwise qualified."

With respect to the fourth prong - whether Scott suffered an adverse action because of his disability - the parties incorporate the arguments made with respect to adverse action in the FMLA retaliation context. The Court has already determined that is it a disputed material fact whether Scott was terminated or resigned. The trier of fact's determination on that issue is the linchpin of this claim as well.

The motion for summary judgment on Scott's NYSHRL claim is denied.[9]

### III.    Summary Judgment is Granted in favor of ESIS and ACE on the FMLA and NYSHRL Claims

Having determined that there is insufficient evidence to permit a trier of fact to find that ESIS and/or ACE are either joint employers or a single integrated employer with ProClaim, summary judgment is appropriate on the both the FMLA retaliation and the NYSHRL claims asserted against them.

### IV.    The Claim for Emotional Damages under the FMLA and for Punitive Damages under the FMLA and NYSHRL

"[B]ecause the FMLA specifically lists the types of damages that an employer may be liable for, and it includes damages only insofar as they are the actual monetary losses of the employee such as salary and benefits and certain liquidated damages" *Smith v. Westchester County*, 769 F. Supp.2d 448, 469 n. 23 (S.D.N.Y.2011) (internal quotation marks omitted), recovery for pain and suffering or emotional distress are not recoverable in an FMLA action. *Cooper*, 847 F. Supp.2d. at 452. Such damages are recoverable, however, under the NYSHRL. *Caravantes v. 53rd St. Partners, LLC*, 2012 WL 3631276, *22 (Aug. 23, 2012). Punitive damages are not recoverable under either statute. *Cooper*, 847 F. Supp.2d. at 452; *Caravantes*, 2012 WL 3631276, * 25.

Accordingly, summary judgment dismissing Scott's claims for emotional and punitive damages under the FMLA and for punitive damages under the both the FMLA and NYSHRL is granted.

---

[9] As the NYSHRL claim remains, the motion for summary judgment on the aiding and abetting claim against Ferdenzi, which is premised solely on the failure of that claim (*see* Defs.' Mem. at 21-22), is accordingly denied.

## CONCLUSION

Defendants' motion for summary judgment is granted (1) as to all claims against ESIS and ACE, (2) the claims for punitive damages under both the NYSHRL and the FMLA, (3) and the claim for emotional damages under the FMLA; it is otherwise denied.

**SO ORDERED.**

Dated: Cental Islip, New York
March 31, 2017                          __/s Denis R. Hurley_____
                                        Denis R. Hurley
                                        United States District Judge